Denio, J.
One of the requisites to a valid will of real or personal property, according to the Revised Statutes, is, that the testator should, at the time of subscribing it, or at the time v-of acknowledging it, declare, in the presence of at least two 1 attesting witnesses, that it is his last will and testament (2 R. S., p. 63, § 40.) The will which the Surrogate of New York admitted to probate, by the order under review, was defectively executed in this particular—the only statement which the alleged testator made to the witnesses being that it was his signature and seal which was affixed to it. It was correctly assumed by the Surrogate in his opinion, and by the Supreme Court in pronouncing its judgment of affirmance, that the instrument could not be sustained as a will under the provisions of the Revised Statutes, but that, if it could be upheld at all, it must be as a will executed in another State, according to the law prevailing there; and, upon that view, it was established by both these tribunals as a valid testament. In point of fact the instrument was drawn, signed and attested at Charleston, in South Carolina, where such a declaration of the testator to the witnesses, as has been mentioned, is not required to consti-; tute a valid execution of a will. Mr. Hunt, the alleged testator, resided at that time in'Charleston'; but, some time before his death, he removed to the city .of New York, and he continued to reside in that city from that time until his death. The will was validly executed, according to the laws of South Carolina,
*396 Although the language of our statute, to which reference has been made, includes, in its generality, all testamentary dispositions, it is, nevertheless, true, that wills, duly executed and taking effect in other States and countries according to the laws in force there, are recognized in our courts as valid acts, so far as concerns the disposition of personal property. (Parsons v. Lyman, 20 N. Y., 103.) This is according to the law jof international comity. Every country enacts such laws as jit sees fit as to the disposition of personal property by its own jcitizens, either inter vivos or testamentary; but these laws are ¡jof no inherent obligation in any other country. Still, all civilized nations agree, as a general rule, to recognize titles to movable property created in other states or countries in pursuance of the laws existing there, and by parties domiciled in such states or countries. This law of comity is parcel of the municipal law of the respective countries in which it is recognized, the evidence of which, in the absence of domestic legislation or judicial decisions, is frequently sought in the treatises of writers on international law, and in certain commentaries upon the civil law which treat more or less copiously upon ■ subjects of this nature.
If the alleged testator in the present case had continued to be an inhabitant of South Carolina until his death, we should, according to this principle, have regarded the will as a valid instrument, and it would have been the duty of our probate courts to have granted letters testamentary to the executors named in it. The statute contemplates such a case when it provides for the proving of such wills upon a commission to be issued by the Chancellor, and for granting letters upon a will admitted to probate in another State. (2 R. S., p. 67, §§ 68, 69.) These provisions do not profess to define under what circumstances a will made in a foreign jurisdiction, not in conformity with our laws, shall be valid. It only assumes that such wills may exist, and provides for their proof.
The question in the present case is, whether, inasmuch as the testator changed his domicil after the instrument was signed and attested, and was, at the time of his death, a resident citi *397 zen of this State, he can, within the sense of the law of comity, be said to have made Ms will in South Carolina. The paper which was signed at Charleston had no effect upon the testator’s property while he remained in that State, or during Ms lifetime. It is of the essence of a will that, until the testator’s death, it is ambulatory and revocable. Ho rights of property, or powers over property, were conferred upon any one by the execution of tMs instrument; nor were the estate, interest or rights of the testator in Ms property in any way abridged or qualified by that act. The transaction was, in its nature, inchoate and provisional. It prescribed the rules by which his succession should be governed, provided he did not change his determination in Ms lifetime. I think sufficient consideration was not given to this peculiarity of testamentary dispositions, in the view which the learned Surrogate took of the case. According to his opinion, a will, when signed and attested in conformity with the law of the testator’s domicil, is a “ consummate and perfect transaction.” In one sense it is, no doubt, a finished affair; but I think it is no more consummate than a bond would be which the obligor had prepared for use by sigmng and sealing, but had kept in his own possession for future use. The cases, I concede, are not entirely parallel; for a will, if not revoked, takes effect by the death of the testator, which must inevitably happen at some time, without the performance of any other act on his part, or the will of any other party; while the uttering of a written obligation, intended to operate inter vivos, requires a further volition of the party to be bound, and the intervention of another party to accept a delivery, to give it vitality. But, until one or the other of these circumstances—namely, the death, in the case of a will, or the delivery, where the instrument is an obligation—occur, the instrument is of no legal significancy. In the case of a will it requires the death of the party, and in that of a bond a delivery of the instrument, to indue it with any legal operation or effect. The existence of a will, duly executed and attested, at one period during a testator’s lifetime, is a circumstance of no legal importance. He must die leaving *398 such a will, or the case is one of intestacy. (Betts v. Jackson, 6 Wend., 173-181.) The provisions of a will made before the enactment of the Revised Statutes, and in entire conformity with the law as it then existed, but which took effect by the death of the testator afterwards, were held to be annulled by certain enactments of these Statutes respecting future estates, notwithstanding the saving contained in the repealing act, to the effect that the repeal of any statutory provision shall not affect any act done, &c., previous to the time of the repeal. (De Peyster v. Clendining, 8 Paige, 295; 2 R. S., p. 779, § 5; Bishop v. Bishop, 4 Hill, 138.) The Chancellor declared that the trusts and provisions of the will must depend upon the law as it was when it took effect by the death of the testator; and the Supreme Court affirmed that doctrine. There is no distinction, in principle, between general acts bearing upon testamentary provisions, like the statute of uses and trusts, and particular directions regarding the formalities to be observed in authenticating the instrument; and I do not doubt that all the wills executed under the former law, and which failed to conform to the new one, where the testator survived the enactment of the Revised Statutes, would have been avoided, but for the saving in the 70th section, by which the new statute was not to impair the validity of the execution of a will made before it took effect. (2 R. S., p. 68.) If, as has been suggested, a will was a consummated and perfect transaction' before the [death of a testator, no change in the law subsequently made-¡would affect it—the rule being, that what has been validly ’done and perfected respecting private rights under an existing -^statute is not affected by a repeal of the law. (Reg. v. The Inhabitants of Denton, 14 Eng. L. Eq., 124, per Lord Campbell, Ch. J.)
If then a will legally executed under a law of this State, would be avoided by a subsequent change made in the law, before the testator’s death, which should require different or additional formalities, it would seem that we could not give effect to one duly made in a foreign state or country, but which failed to conform to the laws of this State, where, at the time *399 .of its taking effect by the testator’s death, he was no longer subject to the foreign law, but was fully under the influence of our own legal institutions. The question in each case is, whether there has been an act done and perfected under the law governing the transaction. If there has been, a subsequent change of residence would not impair the validity of the act. We should be bound to recognize it by the law of comity, just as we would recognize and give validity to a bond reserving eight per cent interest, executed in a State where that rate is allowed, or a transfer of property which was required to be under seal, but which had in fact been executed by adding a scroll to the signer’s name in a State where that stood for a seal or the like. An act done in another State, in order to create rights which our courts ought to enforce on the ground of comity, must be of such a character that if done in this State, in conformity with our laws, it could not be constitutionally impaired by subsequent legislation. An executed transfer of property, real or personal, is a contract within the .protection of the Constitution of the United States, and it creates rights of property which our own Constitution guarantees against legislative confiscation. Yet I presume no one would suppose that a law prescribing new qualifications to the right of devising or bequeathing real or personal property, or new regulations as to the manner of doing it, and making the law applicable in terms to all cases where wills had not already taken effect by the death of the testator, would be constitutionally objectionable.
I am of opinion that a will has never been considered, and that it is not by the law of this State, or the law of England, a perfected transaction, so as to create rights which the courts can recognize or enforce, until it' has become operative by the death of the "testator. As to all such acts which remain thus inchoate, they are in the nature of unexecuted intentions. The author of them may change his mind, or the State may determine that it is inexpedient to allow them to take effect, and require them to be done in another manner. If the lawmaking power may do this by an act operating upon wills *400 already executed, in this State, it would seem reasonable that a general act, like the statute of wills, contained in the Revised Statutes, would apply itself to all wills thereafter to take effect by the death of the testator in this State, wherever they might be made; and that the law of comity, which has been spoken of, would not operate to give validity to a will executed in another State, but which had no legal effect there until after the testator, by coming to reside here, had fully subjected himself to our laws; nor then, until his testamentary act had taken effect by his death.
It may be that this conclusion would not, ■ in all cases, conform to the expectations of testators. It is quite possible that a person coming here from another State, who had executed his will before his removal, according to the law of his former residence, might rely upon the validity of that act; and would die intestate, contrary to his intention, in consequence of our laws exacting additional formalities with which he was unacquainted. But it may be also that a well-informed man, coming here under the same circumstances, would omit to republish, according to our laws, his will, made at his former domicil, because he had concluded not to give legal effect, in this jurisdiction, to the views as to the disposition of his property which he entertained when it was executed. The only practical rule is,that every one must be supposed to know the law under which he lives, and conform his acts to it. This is the rule of law upon all other subjects, and I do not see any reason why it should not be in respect to the execution of wills.
In looking for precedents and juridical opinions upon such a question, we ought, before searching elsewhere, to resort to those of the country from which we derive our legal system, and to those furnished by the courts and jurists of our own country. It is only after we have exhausted these sources of instruction, without success, that we can profitably seek for light in the works of the jurists of the continent of Europe.
The principle adopted by the Surrogate is that, as to the formal requirements in the execution of a will, the law of the country where it was in fact signed and attested is to govern, *401 provided the testator was then domiciled in such country, though he may have afterwards changed his domicil, and have been at his death a domiciled resident of a country whose laws required different formalities. Upon an attentive examination of the cases which have been adjudged in the English and American courts, I do not find anything to countenance this doctrine ; but much authority, of quite a different tendency. The result of the cases, I think, is, that the jurisdiction in/ which the instrument was signed and attested, is of no conse-l quence, but that its validity must be determined according to I the domicil of the testator at the time of his death. Thus, in Grattan v. Appleton ( 3 Story’s R., 755), the alleged testamentary papers were signed in Boston, where the assets were, and the testator died there, but he was domiciled in the British province of Hew Brunswick. The provincial statute required two attesting witnesses, but the alleged will was unattested. The court declared the papers invalid, Judge Stoby j stating the rule to be firmly established, that the law of the | testator’s domicil was to govern in relation to his personal | property, though the will might have-been executed in another | state or country where a different rule prevailed. The Judge referred, approvingly, to Desesbats v. Berquier (1 Bin., 336), decided as long ago. as 1808. That was the case of a will executed in St. Domingo by a person domiciled there, and sought to be enforced in Pennsylvania, where the effects of the deceased were. It appeared not to have been executed according to the laws of St. Domingo, though it was conceded that it would have been a good will if executed by a citizen of Pennsylvania. The alleged will was held to be invalid. In the opinion delivered by Chief Justice Tilghman, the cases in the English ecclesiastical courts, and the authorities of the writers on the law of nations, were carefully examined. It was declared to be settled, that the succession to the personal estate of an intestate was to be regulated according to the law of the country in which he was a domiciliated inhabitant at the time of his death, and that the same rule prevailed with respect to last wills. I have referred to these cases from *402 respectable courts in the United States, because their judgments are more familiar to the bar than the reports of the spiritual courts in England. But these decisions are fully sustained by a series of well considered judgments of these courts. (De Bonneval v. De Bonneval, 1 Curt., 856; Curling v. Thornton, 2 Addams, 6; Stanley v. Bernes, 3 Hag., 373; Countess Ferraris v. Hertford, 3 Curt., 468.) It was for a time attempted to qualify the doctrine, in cases where the testator was a British subject who had taken up his residence and actual domicil in a foreign country, by the principle that it was legally impossible for one to abjure the country of his birth, and that therefore such a person could not change his domicil; but the judgment of the High Court of Delegates, in Stanley v. Bernes, finally put the question at rest. In that case an Englishman, domiciled in Portugal and resident in the Portuguese Island of Madeira, made a will and four codicils, all of which were executed according to the Portuguese law, except the two last codicils, and they were all executed so as to be valid wills by the law of England, if it governed the case. Letters were granted upon the will and two first codicils, but the other codicils were finally pronounced against. The Reporter’s note expresses the result.in these words: “If a testator (though a British subject) be domiciled abroad, he must conform, in his testamentary acts, to the formalities required by the lex domicilii.” (See, also, Somerville v. Somerville, 5 Ves., 750; and Price Dewhurst, 8 Simons, 279, in the English Court of Chancery.)
It is true that none of these decisions present the case of a change of domicil, after the signing .and attesting of a will. They are, notwithstanding, fully in point, if I' have taken a correct view of the nature and effect of a will during the lifetime of the testator. But the remarks of judges in deciding the cases, and the understanding of the Reporters clearly show, that it is the domicil of the testator at the time of his death, which is to be considered in seeking for the law which is to determine the validity of the will. Thus, in De Bonneval v. De Bonneval, the question was upon the validity of the will *403 executed in England, of a French nobleman who emigrated in 1792, and died in England in 1836. Sir Herbert states it to have been settled by the case of Stanley v. Bernes, that the law of the place of the domicil, and not the lex loci rei sites governed “ the distribution of, and succession, to personal property in testacy or intestacy.” The Reporters’ note is, that the validity of a will “is to be determined by the law of the country where the deceased was domiciled at Ms death."
Nothing is more clear than that it is the law of the country I where the deceased was domiciled at the time of his death, which is to regulate the succession of his personalty in the I case of intestacy.' Judge Story says, that the universal doctrines were recognized by the common law, is, that the succession to personal property, ah intestado, is governed exclusively • by the law of the actual domicil of the intestate at the time of his death. (Conf. Laws, § 481.) It would be plainly absurd to fix upon any prior domicil in another country. The one • which attaches to him at the instant when the devolution of property takes place, is manifestly the only one which can have anything to do with the question. Sir Richard Pepper Arden, Master of the Rolls, declared, in Somerville v. Somerville, that the rule was that the succession to the personal estate of an intestate was to be regulated by the law of the country in which he was domiciled- at the time of his death, without any regard whatever to the place of nativity, or the place where his actual death happened, or the local situation of his effects.
Now, if the legal rules which prevail in the country where the deceased was domiciled at his death, are those which are to be resorted to in case of an intestacy, it would seem reasonable that the laws of the same country ought to determine whether in a given case there is an intestacy or not, and such we have seen was the view of Chief Justice Tilghman. Sir Lancelot Shadwell, Vice-Chancellor, in Price v. Dewhurst, also expressed the same view. He.said, “ I apprehend that it is now clearly established by a great variety of cases which it is not necessary to go through in detail, that the rule of lawis this: that *404 when a person dies intestate, his personal estate is to be administered according to the law of the country in which be was domiciled at the time of his death, whether he was a British subject or not; and the question whether he died intestate or not must he determined hy the law of the same country.” The method of arriving at a determination in the present case, according to this rule, is, to compare the evidence of the execution of his will with the requirements of the Revised Statutes. Such a comparison would show that the deceased did not leave a valid will, and consequently that he died intestate.
Being perfectly convinced that according to the principles of the common law, touching the nature of last wills, and according to the result of the cases in England and in this country which have been referred to, the will under consideration cannot be sustained, I have not thought it profitable to spend time in collecting the sense of the foreign jurists, many of whose opinions have been referred to and copiously extracted in the able opinion of the learned Surrogate, if I had convenient access to the necessary books, which is not the case. I understand it to be conceded that there is a diversity of opinion upon the point under consideration among these writers; but it is said that the authors who assert the doctrine on which I have been insisting, are not those of the highest character, and that their opinions have been criticised with success by M. Felix, himself a systematic writer of reputation on the conflict of laws. Judge Story, however, who has wrought in this mine of learning with a degree of intelligence and industry which has excited the admiration of English and American judges, has come to a different conclusion. His language is, “ but it may be asked, what will be the effect of a change of domicil after a will or testament" is made, of personal or movable property, if it is valid by the law of the place where the party was domiciled when it was made, and not valid by the law of his domicil at the time of his death? The terms in which the general rule is laid down would seem sufficiently to establish the principle that in such a case the will and testament is void; for it is the law of his actual domicil at the time *405 of his death, and not the law of his domicil at the time of his making his will and testament of personal property which is to govern.” (§ 473.) He then quotes at length the language of John Yoet to the same general effect. It must, however, be admitted that the examples put by that author, and quoted by Judge Story, relate to testamentary capacity as determined by age, and to the legal ability of the legatees to take, and not to the form of executing the instrument. And the Surrogate has shown, by an extract from the same author, that a will executed in one country according to the solemnities there required, is not to be broken solely by a change of domicil to a place whose laws demand other solemnities. Of the other jurists quoted by the Surrogate, several of them lay down rules diametrically opposite to those which confessedly prevail in this country and in England. Thus, Tollier, a writer on the civil law of France, declares that the form of testaments does not depend upon the law of the domicil of the testator, but upon the place where the instrument is in fact executed; and Felix, Malin and Pothier are quoted as laying down the same principle. But nothing is more clear, upon the English and „ American cases, than that the place of executing the will, if it | is different from the testator’s domicil, has nothing to do with determining the proper form of executing and attesting. In the case referred to from Story’s Reports, the will was executed in Boston, but was held to be invalid because it was not attested as required by a provincial statute of Hew Brunswick, which was the place of the testator’s domicil. If the present appeal was to be determined according to the civil law, I should desire to examine the authorities more fully than I have been able to do; but considering it to depend upon the law as administered in the English and American courts, and that according to the judgment of these tribunals it is the law of the domicil of the testator at the time of his death that is to govern, and not that of the place where the paper happened to be signed and attested, where that is different from his domicil at the time of his decease, I cannot doubt that the Surrogate and Supreme Court fell into an error in establishing the will
*406 I have not overlooked an argument which has been addressed to us, based upon certain amendments of the Revised Statutes,' contained in chapter 320 of the act of 1830. The revised code of the State, as originally enacted, had omitted to make provision for the proving of wills, where the attesting witnesses resided out of the State, and their attendance here could not be procured. The Surrogates’ Courts, to which they committed the proof of wills of real and personal estates, being tribunals of special jurisdiction, and having no common law powers like the Supreme Court, could not issue a commission in such cases, and hence there might often be a failure of justice. It might happen, in various ways, that the witnesses to a will would reside out of the jurisdiction of this State. If the will were executed here by a resident citizen, in the usual manner, the witnesses might change their residence and live in some other state or country, when it came to be proved; or it might be executed out of the State according to the forms prescribed by our statute of wills, by a resident of this State who was temporarily abroad. In either case the will would be perfectly valid, though the Surrogate having jurisdiction would be unable to admit it to probate for want of power to cause the testimony to be taken and returned. To remedy this inconvenience, five new sections were introduced, in 1830, by way of amendment, to the title of the Revised Statutes, respecting the proof of wills, numbered from 63 to 67, inclusive. The provision which they make is limited to the case of “ a will duly executed according to the laws of this State, where the witnesses to the same reside out of the jurisdiction of this Stateand in regard to such wills, it is enacted, that they may be proved by means of a commission issued by the Chancellor upon the application of any person interested; and detailed directions are given respecting the return of the .proof, the allowance of the will and the record of it in the office of the Surrogate having jurisdiction.
But, thus far, the proof of a will made in a foreign jurisdiction, according to the laws of such jurisdiction, and takipg effect there by the death of the testator, was left unprovided *407 for. Such wills are perfectly valid as to personal assets in this State, as was shown in Parsons v. Lyman. We recognize the foreign will, according to the comity of nations, just as we do the rules of distribution and of inheritance of another country when operating upon a domiciled citizen of such country who has died there, leaving assets in this State. Then, as to the proof of such wills, the section following those just mentioned provides for the case in these words: “ Wills of personal estate, duly executed by persons residing out of this State, according to the laws of the state or country in which the same were made, may be proved under a commission to be issued by the Chancellor, and when so proved may be established and transmitted to the Surrogate having jurisdiction,” &c. (§ 68.) The remainder of the section provides for the case of such a foreign will which has been proved in the foreign jurisdiction. Letters testamentary are to be issued in such cases upon the production of an authenticated copy of the will. It is clearly enough implied, perhaps, by the language of this section, that the will, to be proved and established under its provisions, and which is allowed to be executed, as to assets in this State, must be a legal will according to the law of the testator’s domicil in which it was executed; but, for abundant caution, a section is added to the effect that “ no will of personal estate, made out of this State, by a person not being a citizen of this State, shall be admitted to probate under either of the preceding provisions unless such will shall have been executed according to the laws of the state or country in which the same was made.” (§ 69.) Chancellor Walworth appears to have under stood the words, “ a citizen of this State,” as used in this section, to refer to political allegiance; and, “in the matter of Roberts’ will,” he held that the will then in question, executed in the island of Cuba, and which had been proved under a commission, and had been shown to be executed according to the laws of Spain, was a legal will, though the testator was a resident of this State at the time of his death. But he put the decision on the ground that the testator was a foreigner, and not a citizen, though domiciled here, and upon a verbal con *408 struction of the 69th section. Btit Mr. Hunt, the alleged testator in the will now.in question, was not only domiciled here, but he was, at his death, a citizen of this -State, and, consequently, the section, as interpreted by the Chancellor, has no application to the case. He, however, fully-admitted the rule of law to be :as I have stated it, in cases not within the influence of the 69th-section. “The provision of the Revised Statutes requiring wills of personal property tobe executeddn the presence of two witnesses,” he says, “ does not apply to wills executed out of this State by persons domiciled in the state or-country where the will is made, and who continue -to be thus domiciled ■ at the time the will takes effect by death.” “As the testator resided in this State at the time of his death, in 1837, this wifi would be valid according to the law of the testator’s domicil when the will took effect by death, if he had been a citizen .at that time. But, as he was a foreigner, and there -is no evidence that he was ever naturalized here, the amendments of the Revised Statutes of 1830, under which the present proceedings are instituted, expressly prohibit the admitting of the will to probate by a decree of this court, unless it was also duly executed according to the laws of the country where it was actually made.” But for this-case, I should have been of the opinion that the words, “ a citizen of this State,” as used in the'69th section, did not refer to political allegiance, but were used in the sense of a domiciled inhabitant of this State. The meaning of the section would then be, that, if a person, other than a domiciled inhabitant of this State, makes his will out of the State, it "must be executed according to the laws of the state or country where made, or it cannot be admitted to probate here, according, to the preceding provisions of the act. The Chancellor seems to me to have taken the same view of the statute when passing upon the execution of the will of Catharine Roberts. (8 Paige, 619.) He says: “ The statute, in express-terms, authorizes a will of personalty executed out of the State, by a person not domiciled here, to be admitted to probate, provided it is duly executed according to the laws of the state or country where the same was made; and pro *409 Mbits all other foreign wills from being admitted to probate, under the special provisions incorporated into the statutes of April, 1830.” The words, “ a person not domiciled here,” are used in the paraphrase as the equivalent of a person not being a citizen of tMs Stateand I think that rendering is perfectly correct. The provisions of the act do not, in my opinion, suggest any distinction between the place where a will is actually signed and attested and that in which it takes effect by the death of the testator. They are intended to provide simply for the case of the will of a person domiciled out of the State wMch it is desired to prove here; and the statutory mandate is, in effect, that it shall not be established here unless it was executed according to the requirements of the foreign law.
The will under immediate consideration was not, we think, legally executed; and the determination of the Surrogate and of the Supreme Court, which gave it effect, must be reversed.
Comstock, Ch. J., Lott, James, and Hoyt, Js., concurred.