[Civ. No. 5974. Fourth Dist. Nov. 27, 1959.]

LOTTIE MAE MACOMBER, Appellant, v. STATE SOCIAL WELFARE BOARD, Respondent.

Robert W. Kenny and Abe Mutchnik for Appellant.

Stanley Mosk, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Respondent.

COUGHLIN, J. pro tem.*—This is an appeal from a judgment sustaining an order of the State Social Welfare Board discontinuing old age security payments to petitioner for a period of 10 months.

Petitioner began receiving old age security payments under the Welfare and Institutions Code in 1945. The next year she acquired a parcel of real property having street frontage of 132 feet, with a depth of 300 feet, and thereafter lived in a small house on the rear of this property.

In 1956 the Riverside County Department of Public Welfare Board, as authorized agent of the respondent, State Social Welfare Board, pursuant to regulations adopted by the board, determined that the whole of petitioner's real property could not be utilized for the purpose of contributing to her current needs; that the property could be divided into two parcels, each 66 feet by 300 feet in dimension, upon one of which the house was located; that the other parcel was unimproved but was worth $1,500; and that petitioner should take measures to sell this parcel. At this time the whole of petitioner's property was assessed at $360. Upon receiving notice of this determination, the petitioner, instead of attempting to sell the particular parcel, transferred the whole property, as a gift, to the California Institute of Social Welfare, a nonprofit

---

*Assigned by Chairman of Judicial Council.

616

organization, reserving to herself a life estate. After learning of this transfer, the Riverside County Board caused proceedings to be taken which eventually resulted in an order by the respondent board discontinuing old age security payments to petitioner for a period of 10 months. The amount of the suspended payments was $890.

Petitioner undertook a judicial review of this order as provided by section 104.2 of the Welfare and Institutions Code and instituted the instant proceedings.

At the time petitioner transferred her property, which was in October, 1956, section 2001 of the Welfare and Institutions Code provided that every person in need should be entitled to aid in old age from the State "subject to" other provisions of the code, such as (1) Those contained in sections 2163, 2164 and 2160, subdivision (g), respectively rendering ineligible for such aid any person who had personal property of more than $1,200, or real property assessed at more than $3,500, or who made any voluntary assignment or transfer of his property for the purpose of qualifying for aid; (2) Those provisions in section 2007.5 that no person should be denied aid for the transfer of any property which would not have rendered him ineligible under sections 2163 or 2164; and (3) Those provisions in section 2164, added in 1950, that "Real property owned but not occupied as a home by an applicant or recipient shall be *utilized* to provide for the needs of the applicant or recipient." (Italics ours.)

To facilitate administration of social welfare legislation the respondent board was "authorized to adopt rules and regulations, orders, or standards of general application . . . to implement, interpret, or make specific the law enforced by the department" of Social Welfare. (Welf. & Inst. Code, §§ 103, 103.1.)

When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the regulations adopted pursuant thereto must be consistent and not in conflict with the statute and reasonably necessary to effectuate its purpose. (Gov. Code, § 11374.) ██ ██ If, in adopting an administrative regulation under such a grant of authority, a state agency does not confine itself to a reasonable interpretation of the statute, "the legislative area has been invaded and the regulation counts for nought," and the courts are "obligated to strike down an administrative rule which attempts to add to or subtract from the statute." (*County of Los Angeles* v. *State*

*Dept. Public Health,* 158 Cal.App.2d 425, 437-438 [322 P.2d 968] ; *Whitcomb Hotel, Inc.* v. *California Emp. Com.,* 24 Cal. 2d 753, 759 [151 P.2d 233, 155 A.L.R. 405].) The authority of a court to interpret a statute is limited to an interpretation based on the language used; it has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed. *(Seaboard Acceptance Corp.* v. *Shay,* 214 Cal. 361, 365 [5 P.2d 882].) The same rule binds a state agency authorized to enact regulations to interpret a statute.

At the time petitioner transferred her property the board had adopted regulations which then provided:

(1) That ''Real property is considered to be *utilized* when it is contributing to current needs of the applicant or recipient by providing shelter, food or other maintenance items, necessary service, or for producing reasonable net income.'' (Reg. A-133.10) (Italics ours.) This regulation later was amended, and at the superior court hearing the trial judge erroneously was advised that the regulation read as follows: ''Real property is utilized when it is making a reasonable contribution toward current needs, when a plan for its use supports a conclusion that it will so contribute in the immediate future, or when it is sold for an amount consistent with its current market value and the plan and terms of sale are consistent with the requirement of reasonable contribution towards current needs . . .'' The regulation, as just quoted, was adopted after October, 1956, and is now in effect.

(2) That when the home property of a recipient includes ''surrounding land area larger than that normally used for garden, family orchard, etc., which could be rented, leased or otherwise made to produce something of benefit to the owner without restricting the use of the home plot, such portion shall be utilized.'' (Reg. A-133.30.) ;

(3) That ''If real property is not being utilized in one of the ways listed above, a determination is made as to whether utilization is feasible.'' (Reg. A-133.50) ;

(4) That ''Utilization is considered feasible when the nature of the property and the recipient's plans for its use are such that it is reasonable to conclude that it can be made to contribute towards his needs.'' (Reg. A-133.53) ;

(5) That utilization is considered unfeasible when the recipient knows of no way to make the property contribute toward his current needs. (Reg. A-133.56 (1)(a).) ;

(6) That when utilization is not feasible, the recipient is required to immediately offer the property for sale with a

price consistent with the value of similar property in the community unless the net proceeds which a recipient might expect from a sale, together with his other personal property would not exceed $1,200. (Reg. A-133.56, subparagraphs 2 and 3.);

(7) That "In the absence of a continuous and bona fide effort to sell the property by listing it with realtors, advisors, etc., ineligibility results." (Reg. A-133.56, subparagraph 2);

(8) That a transfer of property to avoid utilization results in ineligibility even though the assessed value thereof is less than $3,500. (Reg. A-138.33.);

(9) That a transfer of real property with retention of a life estate as the only consideration results in ineligibility if "Utilization of the property was not feasible but the market value was such that personal property holdings would have exceeded the maximum had the property been sold." (Reg. A-138.34.); and

(10) That the period of ineligibility due to a transfer of real property is the period during which the recipient's equity in the property, had it been sold, would have supported him. (Reg. A-138.40.)

The order of respondent board discontinuing old age payments to petitioner for a period of 10 months was based upon findings that the unimproved parcel of real property which she had been directed to sell could not be utilized except by sale; that the value of this property was $1,500; that petitioner transferred the property to qualify her for aid; that the life estate therein retained by her was worth $1.00; that the interest which she gave away, therefore, was worth $1,499; that petitioner's failure to utilize this property for her needs, by a sale thereof, rendered her ineligible for aid under regulations A-138.33 and A-138.34; and that such ineligibility covered a period of 10 months.

A decisive question on this appeal is whether the term "utilize," as used in section 2164 of the Welfare and Institutions Code, includes a sale; if not, the regulations of respondent board requiring the sale of a recipient's property as a method of utilization are void, and petitioner did not become ineligible for aid upon the transfer of her property. For this reason, among others, petitioner contends that the judgment of the trial court should be reversed.

The term "utilize," as defined in Webster's New International Dictionary, second edition, unabridged, means: "To

make useful; to turn to profitable account or use; to make use of.''

In the following cases, where the courts considered the right of a person to sell property given him for use during life, it was held that the right to use did not include the right to sell.

*McAllister* v. *Long*, 206 Okla. 623 [246 P.2d 352, 353, 354], where the life tenant was devised real property ''to be used by her in any manner that she might deem fit and proper during her life,'' the court said:

''We cannot agree with the contention of the plaintiffs in error that the will gives the widow full and complete power and authority to make any disposition of said property which she might desire. A reading of the will discloses no authority whatever to sell or dispose of said property or to do other than use it as she may deem fit and proper, during her lifetime. Use cannot be construed to mean to dispose of.''

*Goudie* v. *Johnston*, 109 Ind. 427 [10 N.E. 296, 297], where the court said:

''In our judgment the controlling words of this will are, 'for use during her natural life-time,' for there are no other words of equal power in the instrument. These words not only confine the first taker's estate to her life, but they further confine it by declaring that the property is for her use. If the property is for her use during her natural life-time, it is difficult, if not impossible, to conceive how she can have an absolute power of disposition. . . .

''It cannot justly be affirmed that one to whom property is bequeathed 'for her use' during life is clothed with a power of disposition; for the word 'use' is one of much force, and confines the estate to the hands of the first taker, since it is logically inconceivable that one having a right to use can possess the absolute power of alienation.''

*Hurt* v. *Hurt*, 121 Va. 413 [93 S.E. 672, 674]—followed in *Taylor* v. *Taylor*, 176 Va. 413 [11 S.E.2d 587, 590]—where it was said:

''Now, with respect to the personal property to be left in the possession of the wife for 'her use': The word 'use' does not in its ordinary meaning import any power of disposition of the corpus referred to—the jus disponendi of the corpus— but the contrary; indeed, only the right to use and enjoy the benefit of the corpus is implied by the word 'use.' *In re Moor's Estate*, 163 Mich. 353 [128 N.W. [198] 199]. The only proper 'use' to which the intangible personal estate could be put by the wife would be to enjoy the income from it. . . .''

In considering the effect of a provision in a mortgage consenting to the mortgagor's use of mortgaged property, the court, in *Estes* v. *First Nat. Bank,* 15 Colo.App. 526 [63 P. 788, 792, said : "Speaking generally, there is no use of property apart from its possession, and to sell is not to use."

Section 2164 of the Welfare and Institutions Code provides : "No aid under this chapter shall be granted or paid to any person who owns real property the assessed value of which as assessed by the county assessor, less all encumbrances thereon of record, exceeds three thousand five hundred dollars ($3.500). Real property owned but not occupied as a home by an applicant or recipient shall be utilized to provide for the needs of the applicant or recipient."

The first sentence of section 2164 is negative in character, and places a limitation upon the granting of aid by declaring ineligible therefor any person who owns real property exceeding $3,500 in assessed value. Stated in positive terms, the first sentence of that section provides that a recipient of aid for aged may own real property not to exceed $3,500 in assessed valuation. The second sentence of section 2164 requires that this real property, if not occupied as a home, shall be utilized to provide for the needs of such recipient. It is significant that this second sentence does not declare ineligible for aid a person owning real property that may not be utilized to provide for his needs. Stated otherwise, the statute permits the ownership of real property by a recipient but requires that it be utilized for a specific purpose. If the property is not fit to be utilized for that purpose, the statute does not declare ineligibility on account of its ownership.

Under respondent board's regulations a recipient of aid may be required to sell real property which section 2164 permits him to own; to change that real property into personal property; and, thus, to bring himself within the ineligibility classification defined by section 2163, because the proceeds of such a sale exceed $1,200. No sensible purpose is served by legislation declaring a person eligible for aid who owns real property not to exceed in value a designated amount, but, after aid is granted, requires that person to sell such property in order to remain eligible. An interpretation effecting such a result is unreasonable.

The fact that the board's existing regulations do not require a sale until it has been determined that the property is not susceptible to certain specified uses is no answer to the contention that section 2164 does not require a sale under any

circumstances. A regulation requiring a sale of property only after a determination of its nonavailability for indicated uses is based on the existence of statutory authority to require a sale as a method of utilization, and is not an interpretive factor in determining whether the statute confers such authority.

The regulations which require a recipient of aid to sell his real property deprive him of the ability to utilize it for his needs. He may utilize the cash proceeds from the sale of the property for his needs, but not the property itself, the products from its soil, or its income.

The regulations under consideration not only ascribe to the Legislature an intention to require real property to be sold to effect its use for the needs of a recipient, but also to require such property to be consumed to effect that purpose. Regulation A-133.56 directs a recipient to immediately offer his real property for sale when "utilization is not feasible" unless the sale would be a "useless act," and determines that a sale would be a "useless act" only if the net proceeds reasonably expected therefrom, together with his other personal property holdings, would not exceed $1,200. If the total of such holdings after sale exceed $1,200, he becomes ineligible for aid. (Welf. & Inst. Code, § 2163.) Therefore, unless assistance comes from other sources, a recipient of aid who is required to sell his real property, must consume the proceeds from his sale for current needs, until eligibility is reestablished by a reduction in the amount of his personal property holdings. Ordinarily, the term "use," when applied in instruments transferring real property to a person for his use during his life, means a use without impairment of the principal. (*Hardy* v. *Mayhew*, 158 Cal. 95, 99 [110 P. 113, 139 Am.St.Rep. 73]; *Mead* v. *Welch*, 95 F.2d 617, 619.) There is no reason to believe that the Legislature considered a different interpretation of the term "use" or "utilize" when applying it to the statute under consideration.

In *Special School Dist. No. 5* v. *State*, 139 Ark. 263 [213 S.W. 961], when considering the legality of a legislative enactment authorizing the sale of federally granted lands and authorizing the use of funds from such a sale for the building and equipping of a high school, the lands having been transferred to the State of Arkansas by an act of Congress "for the use of the inhabitants" of a particular township "for the use of schools," the court said:

"We conclude, therefore, that the words 'for the use of the

inhabitants of such township for the use of schools,' contained in the grant of Congress, limit the state in her execution of the trust, through her sovereign agent the Legislature, to the purposes indicated by the meaning of the word 'use.' This word has a potential significance, and shows that the parties to the compact never intended that . . . the land itself, or the proceeds thereof if sold, should be turned over to the inhabitants of the township, the beneficiaries of the trust, but, on the contrary, that the lands or their proceeds should be put to use for the maintenance and support of schools.

''The act under review provides that the funds derived from the sale . . . shall be reinvested in a building and equipment in Blytheville, to be used for high school purposes. By the act in question the property itself, or the corpus of the trust, is exhausted and used in a building for the benefit of students . . . The Act thus violates the plain terms of the contract or compact between the United States Government and the state as evidenced by the act of Congress of 1836, containing the grant, and the ordinance of the state accepting the same, and is therefore void.''

By its own interpretation, through regulations in force at the time of the transaction under consideration, the respondent board recognized a distinction between utilization and sale, because in Regulation A-133.56 it was provided that ''when utilization is not feasible, the recipient is required to immediately offer the property for sale . . .'' Respondent argues that the term ''utilized'' as applied by its regulations was used in two respects, i.e., ''utilization'' in its broad concept and ''utilization'' of property by means other than by sale. However, in order to overcome an obviously conflicting interpretation, respondent amended Regulation A-133.10, as heretofore noted, so as to include a sale within the definition of utilization. Nevertheless, in Regulation A-138.34, which is presently in force, the distinction continues to be noted. This regulation provides that the transfer of real property with retention of a life estate results in ineligibility if ''*utilization* of the property was not feasible, but the market value was such that personal property holdings would have exceeded the maximum had the property been *sold*.'' (Italics ours.)

The difference between requiring real property to be put to use for the needs of a recipient by occupancy, tillage or rendering it income producing, and requiring it to be sold in order that the proceeds from such a sale may be expended to provide such needs, is a difference readily noted; is demon-

strated by the phraseology of respondent board's regulations; and is so marked that to characterize all of these acts under the single term "utilize," as that term appears in section 2164, would be unreasonable. The regulations requiring the recipient to sell his real property and apply the proceeds therefrom to his needs have exceeded the powers of reasonable interpretation; have added to the statutory provision, and, therefore, are void. The petitioner was entitled to retain the real property in question even though it was not feasible to utilize the same for her needs. Under the circumstances her transfer of that property with retention of a life estate did not subject her to ineligibility. (Welf. & Inst. Code, § 2007.5.)

Any abuses in property ownership by old age security recipients as may develop under the present law are properly the subject of legislative correction and not by the judiciary.

The foregoing determination renders unnecessary a consideration of other contentions urged by appellant.

The judgment is reversed.

Griffin, P. J., and Shepard, J., concurred.